UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LARRY GANTT, JR.,

                              Plaintiff,

        v.

MICHAEL FERRARA, *et al.*,

                              Defendants.

No. 15-CV-7661 (KMK)

OPINION & ORDER

Appearances:

Larry Gant
Auburn, NY
*Pro se Plaintiff*

Kimberly Hunt Lee, Esq.
McCabe & Mack LLP
Poughkeepsie, NY
*Counsel for Defendant Eric Henderson*

KENNETH M. KARAS, United States District Judge:

        Pro se Plaintiff Larry Gant, Jr. ("Plaintiff"), currently incarcerated at Auburn Correctional

Facility, brings this Action, pursuant to 42 U.S.C. § 1983, against the City of Newburgh Police

Department, former Police Chief Michael Ferrara ("Ferrara"), and Officers Joseph Cerone

("Cerone"), Kevin Lahar, Mike Pitt, Aaron Weaver and Eric Henderson ("Henderson" or

"Defendant") (collectively, Initial Defendants"). (*See* Compl. (Dkt. No. 2); Am. Compl. (Dkt.

No. 70).) Plaintiff claims that Initial Defendants violated his rights under the Fourteenth

Amendment when he was assaulted during an incident on November 3, 2012. (*Id.* ¶¶ 10–23.)

As a result of prior motions, Initial Defendants, except for Henderson, have been dismissed from

the suit with prejudice. (*See* Dkt. Nos. 67, 93.)

Before the Court is Henderson's Motion for Summary Judgment (the "Motion"). (*See* Def.'s Not. of Mot. ("Not. of Mot.") (Dkt. No. 144).) For the reasons explained herein, the Motion is granted.

## I. Background

### A. Factual Background

The following facts are taken from Henderson's statement pursuant to Local Civil Rule 56.1, (Def.'s Local Rule 56.1 Statement ("Def.'s 56.1") (Dkt. No. 148)),[1] and the exhibits

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The nonmoving party must then submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." *Id.* at 56.1(b). "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule." *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same). "A pro se litigant is not excused from this rule." *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (citation and italics omitted). Here, Henderson filed and served his 56.1 Statement, (Def.'s 56.1), in addition to a statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (Dkt. No. 149). Despite this notice, Plaintiff failed to submit a response to Henderson's 56.1 Statement. Accordingly, the Court may conclude that the facts in Henderson's 56.1 Statement are uncontested and admissible. *See Brandever*, 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record," when deciding the instant Motion, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted); *see also Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although [the] plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in [the] defendants' Rule 56.1."); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the

submitted by Henderson, including several affidavits, (Aff. of Kimberly Hunt Lee, Esq. ("Lee Aff.") (Dkt. No. 145); Aff. of Eric Henderson ("Henderson Aff.") (Dkt. No. 146); Aff. of James Cerone ("Cerone Aff.") (Dkt. No. 147)); Plaintiff's deposition transcript, (Lee Aff. Ex. B ("Pl.'s Dep.") (Dkt. No. 145-2)); and a transcript of Plaintiff's testimony in his state court criminal trial (Lee Aff. Ex. D ("Pl. Test. Tr") (Dkt. No. 145-4)).[2]  These facts are recounted in the light most favorable to Plaintiff, the non-movant.  *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).  Henderson has sent the required Rule 56.2 Notice to Plaintiff.  (*See* Dkt. No. 149.)

---

[motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response (citation omitted)); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (italics and quotation marks omitted)).  The Court will therefore consider whether any facts in the record, including Plaintiff's deposition testimony and the exhibits offered by Plaintiff in opposition to the Motion, contradict Henderson's 56.1 Statement.

[2] Plaintiff also submits several partial transcripts of witness testimony from his state criminal trial as exhibits to his (belated) Response.  (*See* Pl.'s Mem. of Law in Opp'n to Mot. for Summ. J. ("Pl.'s Mem.") Exs. B–F (Dkt. No. 174).)  Defendant urges the Court to refrain from considering these documents.  (*See* Def.'s Reply in Further Supp. of Mot. for Summ. J. ("Def.'s Reply") 1–4 (Dkt. No. 169).)  First, Defendant argues that Plaintiff failed to respond to his Rule 56.1 Statement, and so the facts contained therein must be deemed admitted.  (*Id.* at 1–2.) *See Brandever*, 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact").  Second, Defendant points out that the instant transcripts are partial and that the witnesses were not disclosed during discovery.  (Def.'s Reply 2–4.)  Accordingly, Defendant argues, the Court should reject these documents because they do not contain admissible evidence.  (*Id.*) *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("The principles governing admissibility of evidence do not change on a motion for summary judgment. . . . [O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." (citation omitted)).

The Court need not decide this issue, however, because at best, testimony from Plaintiff's state court criminal trial simply supports elements of the account already advanced in Plaintiff's own deposition.  As the Court does not decide disputes of facts, additional witness testimony that bolsters Plaintiff's narrative makes no difference for the purposes of the instant Motion.

## 1.  The Evening Begins

On the night of November 2 (and early morning of November 3), 2012, Plaintiff and his friend Mindu Allah ("Allah") went out to celebrate Plaintiff's wife's pregnancy.  (Def.'s 56.1 ¶ 4; Pl.'s Dep. 37.)[3]  They began the evening at a bar in Beacon, New York, and eventually shifted to a bar in Newburgh, New York, the Terrace Lounge.  (Def.'s 56.1 ¶ 5.)  While at the Terrace Lounge, they were joined by Plaintiff's brother, Malcolm "Morrell" Melville ("Melville") at about 2 a.m.  (*Id.* ¶ 6; Pl.'s Dep. 39–40.)  Allah and Plaintiff then proceeded to a second Newburgh bar, the Dry Dock Bar, dropping Melville off nearby.  (*Id.* at 40–42.)[4]  The Dry Dock Bar was crowded, with approximately 75 people present, but Plaintiff believes he "stood out" because he was not from Newburgh.  (*Id.* at 45–46; Def.'s 56.1 ¶ 8.)

While on the dance floor at Dry Dock Bar, Plaintiff engaged in a brief altercation with another person who appeared to be drunk.  (*Id.* ¶ 9; Pl.'s Dep. 45–48.)  This person repeatedly asked Plaintiff "in a hostile way" to "back up," and eventually he and Plaintiff exchanged brief shoves before being separated by Allah.  (*Id.* at 46–47.)  At approximately the same time, another, unrelated scuffle took place in different part of the bar, and Plaintiff and Allah decided to leave.  (*Id.* at 46–49.)  As they returned to the car, Plaintiff and Allah were suddenly rejoined by Melville, who hurriedly leapt into the backseat.  (*Id.* at 51–52.)  However, as Plaintiff drove away, he noticed a crowd gathering on the street behind them, and Melville called out that his friend Durrell "Black" Johnson ("Black") was being chased by members of the crowd.  (*Id.* at

---

[3] There appears to be some confusion about whether this individual's first name is "Miadu" or Mindu."  In his deposition, Plaintiff referred to him as Miadu, (*see* Pl.'s Dep. 37), but the transcript of Plaintiff's testimony at his state criminal trial suggests that his name is "Mindu," (Pl. Test. Tr. 14).

[4] Plaintiff's testimony at his state criminal trial suggests that Melville entered the bar with Plaintiff and Allah.  (Pl. Test. Tr. 25.)  This detail is immaterial to the issues before the Court.

53–54.)  Melville then jumped out of Plaintiff's (slowly) moving car in an attempt to help Black. (*Id.* at 55.)

Plaintiff circled the block once in the hopes of finding and collecting Melville, and as he returned to the street in front of the Dry Dock Bar, Plaintiff noticed that there seemed to be something "emotional . . . flaring" in the crowd.  (*Id.* at 56–59.)  Plaintiff then stopped the car near where he had parked earlier that evening and exited the car to try to find his brother.  (*Id.* at 60–61.)  As he walked into the crowd searching for Melville, Plaintiff did not see police officers or police cars.  (*Id.* at 63–64.)  Plaintiff spotted a person whom he believed to be Melville and headed toward him.  (*Id.* at 64.)

Meanwhile, at approximately 2:30 a.m., police responded to a call that a large fight was in progress at the Dry Dock Bar.  (Def.'s 56.1 ¶ 22.)  Henderson and several other officers arrived on the scene in uniform.  (*Id.* ¶¶ 23–26.)  Upon arrival, they discovered a large crowd of 70 to 80 people in the street, many of whom were fighting.  (*Id.* ¶¶ 25–26.)

### 2.  Accounts Diverge

#### a.  Henderson's Account

At this point, accounts begin to diverge.  According to Henderson and a second officer, they arrived on the scene and discovered Plaintiff fighting with another individual.  (*Id.* ¶ 27; Henderson Aff. ¶¶ 5–8; Cerone Aff. ¶ 6.)  Henderson approached and shouted "police," and he then saw the person with whom Plaintiff was fighting fall to the ground, apparently unconscious. (Henderson Aff. ¶¶ 7–8.)  When Plaintiff continued to strike at the fallen person, Henderson attempted to use pepper spray on Plaintiff, but when that had no effect, Henderson grabbed Plaintiff by the left shoulder and pulled him off of his apparent victim.  (*Id.* ¶¶ 8–9; Cerone Aff. ¶ 7; Def.'s 56.1 ¶¶ 28–30.)  When Plaintiff regained his balance, he stood for a moment staring

silently at Henderson and turned to leave.  (Henderson Aff. ¶¶ 10–11.)  Henderson then grabbed Plaintiff's left wrist and attempted to place it in a handcuff, but Plaintiff pulled his hand away and attempted to tackle Henderson.  (*Id.* ¶¶ 11–12; Def.'s 56.1 ¶ 31.)  Henderson and Plaintiff then grappled with one another and slid to the ground with Henderson ending up on top of Plaintiff.  (Henderson Aff. ¶¶ 12–14; Cerone Aff. ¶ 8.)

### b.  Plaintiff's Account

Plaintiff adamantly denies the described altercation with Henderson.  (Pl.'s Dep. 111–12.)  Instead, Plaintiff attests that as he headed through the crowd toward his brother, he was suddenly confronted from the back and side by three individuals whom he had not previously met.  (*Id.* at 64–65.)  The individuals surrounded Plaintiff, told him to "settle down" and said, "what's up now," signaling that they intended to attack him.  (*Id.* at 66–68.)[5]  Plaintiff considered running away, but he determined that the crowd was too thick.  (*Id.* at 68.)

As the first of these assailants approached, Plaintiff swung at him.  (*Id.*)  Quickly, all three assailants began hitting and swinging at Plaintiff; Plaintiff tried to fight them off, but his initial assailants were soon joined by several additional attackers.  (*Id.* at 69.)  Although Plaintiff noticed that one of his attackers had a knife, he did not realize at first that he was being stabbed.  (*Id.* at 69–70.)  Plaintiff succeeded in catching the hand of an armed assailant (but injured his own hand in the process) by biting the assailant in the hand, and was thus able to seize the knife.  (*Id.* at 70, 75, 88.)  Using his left hand, Plaintiff began to swing the knife, attempting to stab the individuals who were around him.  (*Id.* at 75–76.)

---

[5] Plaintiff's state criminal trial testimony differs slightly.  In that testimony, Plaintiff attests the encounter with his assailants began not with a verbal approach, but when he was struck in the back of his head.  (Pl. Test. Tr. 36.)  Again, the difference is not material.

Eventually, Plaintiff was brought to the ground, and, as he continued to struggle, he realized he had been stabbed repeatedly during the encounter. (*Id.* at 69–70.) While on the ground, Plaintiff curled into a defensive position leaning on his right side with his left shoulder exposed. (*Id.* at 77.) Plaintiff was then repeatedly punched, stabbed and stomped on, sustaining injuries to his back, left side, right leg, temple, and the back of his head. (*Id.* at 71–73, 88.)[6] Throughout the attack, Plaintiff did not hear sirens, did not see police officers, dogs or cars, and did not hear anyone call out "police." (*Id.* at 74.) At some point during the attack, Plaintiff lost consciousness. (*Id.* at 74–75.) When he awoke, Plaintiff was flat on his back and his hands were at his side. (*Id.* at 78.) Plaintiff discovered that "someone" (apparently Henderson) was "straddling" him from above, and he felt that he was "being shaken." (*Id.* at 78–80.)

### 3. Plaintiff and Henderson Exchange Blows

At this point, the narratives once again converge. Plaintiff attests that, in "fight/flight mode," he "automatically start[ed] swinging" the knife at the person above him. (*Id.* at 83.) Plaintiff attests that he continued to swing even as the person above him attempted to, and eventually succeeded in, grabbing his hands and dislodging the knife. (*Id.* at 84–85.)

Similarly, Henderson attests that Plaintiff continued to swing his fists at Henderson, and Henderson responded with punches and attempted to place Plaintiff in handcuffs. (Henderson Aff. ¶ 14.) Henderson believes he threw between three and six punches over the course of five to eight seconds. (*Id.*) As Henderson attempted to gain control of Plaintiff's hands, he realized that Plaintiff was holding a knife in his left hand and attempted to grab Plaintiff's left wrist. (*Id.*

---

[6] Portions of Plaintiff's account appear to have been corroborated by an eyewitness who testified at Plaintiff's criminal trial. (*See* Pl's Mem. Ex. I ("Hines Tr."), at 1668, 1679–82 (Dkt. No. 174 at ECF 95).) As noted above, *supra* note 2, such corroboration adds little to the Court's consideration of the instant Motion.

¶¶ 15–16.)  Plaintiff then switched the knife to his right hand, but Henderson was eventually able to seize Plaintiff's right wrist and, by squeezing it, forced Plaintiff to drop the knife to the ground.  (*Id.* ¶ 16.)[7]  Henderson then noticed blood and realized he had been stabbed several times on the right side of his neck and on his left arm.  (*Id.* ¶ 17.)  Henderson was escorted to a police cruiser and taken first to St. Luke's Hospital and then transferred to Westchester Medical Center.  (*Id.* ¶ 18.)  Henderson later learned that the knife wounds inflicted by Plaintiff barely missed his carotid artery.  (*Id.*)

Meanwhile, Plaintiff was handcuffed and dragged a short distance away, where he lay on the ground for some time.  (Pl.'s Dep. 85–86.)  Plaintiff attempted to stand up, but was unable to do so.  (*Id.* at 117.)  Plaintiff was then taken by stretcher and ambulance to St. Luke's hospital, and eventually by helicopter to Westchester Medical Center.  (*Id.* at 90–91; Pl. Test. Tr. 59–60.)  Plaintiff lost consciousness several times during the time he was transported and again while at the hospital.  (Pl.'s Dep. 91–92.)  It was only upon arriving at Westchester Medical Center that Plaintiff learned the extent of his injuries and was formally placed under arrest.  (*Id.* at 90, 95.)  Plaintiff, who had a collapsed lung and a punctured kidney, received two blood transfusions and underwent kidney surgery.  (*Id.* at 93, 95.)  He remained at Westchester Medical Center for three days, before being released to Orange County Jail.  (*Id.* at 99.)  Although Plaintiff acknowledges

---

[7] While the Parties are in substantive agreement about the struggle between Henderson and Plaintiff once the two were on the ground, they differ with respect to Plaintiff's mental state during the encounter.  Henderson attests that Plaintiff was conscious and actively engaged throughout the incident.  (Henderson Aff. ¶ 19.)  By contrast, Plaintiff attests that he was "still in a fog" and couldn't see the face or skin color of the person on top of him, or even hear clearly.  (Pl.'s Dep. 82.)  Plaintiff also attests that he "was still under the perception" that his assailants were around him, and that he did not realize that the person straddling him was, in fact, a police officer until he reached the hospital.  (*Id.* at 83–84.)

that the bulk of his injuries were caused by his assailants, he also believes that Henderson "may have contributed" to his face injury, including his black eyes. (*Id*. at 109.)

### 4. Plaintiff's State Court Conviction

Plaintiff was charged in Orange County in connection with the above incident. (*See* Lee Aff. Ex. C ("Verdict Tr."), at 1, 7–9 (Dkt. No. 144-3).) Most charges related to Plaintiff's assault on Henderson, and two charges related to alleged assaults on other victims. (Pl.'s Dep. 21.) The jury found Plaintiff guilty of one count of attempted assault in the first degree, one count of attempted aggravated assault upon a police officer, two counts of assault in the second degree, and one count of criminal possession of a weapon in the third degree. (Verdict Tr. 7–9; Pl.'s Dep. 22–23.) Each of these counts related to Plaintiff's conduct toward Henderson. (*Id*. at 23.) The jury found Plaintiff not guilty of one count of attempted murder in the first degree, one count of attempted murder in the second degree, two counts of assault in the first degree, one count of aggravated assault upon a police officer, one count of assault upon a police officer, and two counts of assault in the second degree. (Verdict Tr. 7–9.) These counts included all charges related to Plaintiff's alleged conduct toward civilians. (Pl.'s Dep. 23.) The state court remanded Plaintiff pending sentencing, (Verdict Tr. 13), and subsequently sentenced Plaintiff to fifteen years' imprisonment, (Pl.'s Dep. 23).

### B. Procedural History

Plaintiff filed his initial Complaint and Application to Proceed in Forma Pauperis ("IFP") on September 29, 2015. (Dkt. Nos. 1–2.) On October 6, 2015, IFP status was granted. (Dkt. No. 4.) On October 13, 2015, the Court issued an Order of Service that, inter alia, dismissed claims against the City of Newburgh Police Department and substituted the City of Newburgh as the relevant defendant. (Dkt. No. 6.) On March 21, 2016, Initial Defendants filed a Motion to

Dismiss and accompanying papers. (Dkt. Nos. 28–32.) By Opinion and Order dated March 29, 2017, the Court dismissed Plaintiff's claims except for claims against Ferrara and the excessive force claim against Henderson. (Dkt. No. 55.) The Court allowed Plaintiff 30 days to file an amended complaint, but warned that failure to do so would convert the dismissal to dismissal with prejudice. (*Id.*) On July 14, 2017, after two extensions and over 100 days, the Court issued an Order dismissing with prejudice the claims against Cerone, Lahar, Weaver, Pitt and the City of Newburgh. (Dkt. No. 67.)

On August 30, 2017, the Court docketed Plaintiff's Amended Complaint, in which he pursues claims against Ferrara and Henderson only. (Dkt. No. 70.) On October 26, 2017, Ferrara and Henderson filed a Motion to Dismiss and accompanying papers. (Dkt. No. 75–77.) By Opinion and Order dated September 27, 2018, the Court dismissed all claims against Ferrara, leaving only Plaintiff's excessive force claim against Henderson. (Dkt. No. 93.)

On August 26, 2019, Henderson filed the instant Motion for Summary Judgment and accompanying papers. (Dkt. Nos. 144–150.) After receiving several extensions, Plaintiff was given a final deadline to submit his Response by December 15, 2019. (Dkt. No. 163.) On December 20, 2019, the Court received a letter from Kisha Grant, Plaintiff's wife, requesting an additional 30-day extension. (Dkt. No. 164.) In early January 2020, Henderson and the Court finally received Plaintiff's Response. (Dkt. No. 165, 174.) On January 27, 2020, Henderson submitted a Reply and accompanying papers. (Dkt. No. 167–69.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . ., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party

opposing summary judgment may not merely rest on the allegations or denials of his pleading

. . . .").  And, "[w]hen opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v.*

*Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental*

*Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role

of the court is not to resolve disputed issues of fact but to assess whether there are any factual

issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted).  Thus, a court's goal should

be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr*

*Labs. Inc*., 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323–24 (1986)).  However, a district court should consider only evidence

that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d

736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the

statements 'must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso*,

691 F.3d at 230 (quoting Fed. R. Civ. P. 56(c)(4)).

As a general rule, "district courts may not weigh evidence or assess the credibility of

witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d

Cir. 2005); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986) (noting that at the

summary judgment stage, the court is not to "weigh the evidence and determine the truth of the

matter"); *Vital v. Interfaith Med. Ctr*., 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of

credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quotation marks omitted)).  Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court."").  And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact.").

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham*, 848 F.2d at 344; *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation marks omitted).  "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment." *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d

346, 351 (E.D.N.Y. 2014) (alterations, italics, and quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

## B.  Analysis

At this stage of the proceedings, only one of Plaintiff's claims remains: a claim against Henderson for the use of excessive force in "seizing" Plaintiff's person in the early morning of November 3, 2015.  Henderson argues that the Court should dismiss the claim because the undisputed facts do not support a viable claim under the Fourth Amendment; because Plaintiff's account of events is so fanciful it could not be credited by a rational jury; and because Henderson is entitled to qualified immunity.  (Def.'s Mem of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 12–20 (Dkt. No. 150).)  Here, the Court need only address Henderson's first argument.

### 1.  Material Facts

As noted, Plaintiff's and Defendant's accounts of the moments prior to when Plaintiff found himself beneath Henderson diverge substantially.  Plaintiff attests that he was set upon by several individuals, did not see any officers on the scene, and never attempted to tackle Henderson.  (Pl.'s Dep. 65–85, 111–12.)  By contrast, Henderson attests that he arrived on the scene to see Plaintiff assaulting a single individual, that he sought to restrain Plaintiff with warnings, pepper spray and a physical pull, and that Plaintiff then tackled him.  (Henderson Aff. ¶¶ 5–12.)  It also appears that each Party has additional witnesses who have attested to their version of events.  (*See* Cerone Aff. ¶¶ 6–7; Hines Tr. 1668, 1679–82.)

The Court need not attempt to resolve or reconcile these two versions of events, however, because the only moments material to the instant claim are those in which Henderson allegedly used excessive force against Plaintiff.  With respect to these crucial moments, the two accounts are substantially similar.  Both Parties agree that Henderson only began punching Plaintiff after

Plaintiff waved his fists—and a knife—upward toward Henderson.  (Pl.'s Dep. 83; Henderson Aff. ¶ 14.)  Both Parties agree that Henderson struggled with Plaintiff for control of the knife.  (Pl.'s Dep. 84; Henderson Aff. ¶¶ 15–16.)  Both Parties agree that Henderson punched Plaintiff between three and nine times during a struggle in which Plaintiff resisted.  (*Id*. ¶ 14; Hines Tr. 1688–89; Am. Compl. ¶ 19.)  Both Parties also agree that Plaintiff inflicted serious wounds on Henderson during that struggle.  (Henderson Aff. ¶¶ 17–18; Pl. Test. Tr. 69–70.)

As demonstrated below, these facts are all that are necessary to resolve the instant Motion.  Moreover, insofar as contested facts might shed additional light on this encounter, the Court may—and does—adopt the perspective of Plaintiff.  *See Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996) (explaining that a non-movant "will have his allegations taken as true, and will receive the benefit of the doubt when his assertions conflict with those of the movant" (citation and quotation marks omitted)).  Accordingly, for the purposes of this Motion, the Court assumes (as attested to by Plaintiff) that Henderson and Plaintiff had no prior encounter before Henderson approached and leaned over a wounded and unconscious Plaintiff.  (*See* Pl.'s Dep. 74–83.)

### 2.  Applicable Legal Standard

The Fourth Amendment prohibits officers from using excessive force in making arrests; thus, the excessiveness of such force is analyzed under that Amendment's "reasonableness standard."  *Graham v. Connor,* 490 U.S. 386, 395 (1989); *see also Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 591 (S.D.N.Y. 2013) ("Claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen [are] analyzed under the Fourth Amendment and its reasonableness standard." (citation, alteration, and quotation marks omitted)).  "[T]he reasonableness question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting

them, without regard to their underlying intent or motivation." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002) (citation omitted). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . ., and the officer's state of mind, whether evil or benign, is not relevant." *Brown v. City of New York*, 798 F.3d 94, 100–01 (2d Cir. 2015) (citation, footnote, and quotation marks omitted). Determining excessiveness requires "a careful balancing" that takes into consideration (at least) "the following three factors: [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 100 (alterations and quotation marks omitted) (quoting *Graham*, 490 U.S. at 396). "Generally, the force used by the [d]efendant must be more than de minimis in order for an excessive force claim to be actionable." *Musso v. City of New York*, No. 05-CV-2511, 2008 WL 3200208, at *4 (E.D.N.Y. July 24, 2008) (citation, italics, alteration, and quotation marks omitted).

### 3. Application

In his Amended Complaint, Plaintiff alleges two separate moments when Henderson may have used excessive force. First, Plaintiff alleges that Henderson "was seen . . . shak[ing] and striking [P]laintiff in the facial area when [P]laintiff was on the ground unconscious." (Am. Compl. ¶ 18.) Second, Plaintiff alleges that Henderson "admitted to striking [P]laintiff in the face at least nine times." (*Id.* ¶ 19.) The record evidence does not support a Fourth Amendment claim with respect to either of these two moments.

### a. Conduct While Plaintiff was Unconscious

As the Court noted in its March 29, 2017 Order, where an officer strikes or violently assaults an individual while that individual is on the ground unconscious, such conduct is likely

"not objectively reasonable." (Order 33–34 (Dkt No. 55).) Here, however, no evidence supports the claim that Henderson did any such thing. On the contrary, Plaintiff's own evidence suggests only that Henderson leaned over Plaintiff and shook him to check if he was alive. For example, in his deposition, Plaintiff attested as follows: "I felt somebody on top of me. I felt like I was being shaken. I felt like I was being hit, but I wasn't sure and I'm still not sure to this day. I don't know if I was being hit or I was being shaken. I thought I was being shaken more so than I was being hit. And I believe that's what woke me up." (Pl.'s Dep. 80.) Later in his deposition, Plaintiff clarifies further: "I was on the ground . . . when the officer got on top of me to shake me. From what I believe, he was really doing it to see if I was alive. He didn't know if I was alive or not." (*Id.* at 87.)[8] Similarly, in his criminal trial, Plaintiff testified that, when he regained consciousness, Henderson "was sitting on me. I don't know exactly how he was sitting on me. I was being shaken, and I thought I was being punched." (Pl. Test. Tr. 50.)[9] Straddling

---

[8] While the Court does not decide whether Plaintiff's proffered partial transcripts are admissible, *see supra* note 2, the Court notes no such transcripts establish that Henderson punched Plaintiff while he was unconscious. (*See* Hines Tr. 1685–88 ("[Henderson] walked over to [Plaintiff], and . . . he got over on top of [Plaintiff] while he was still laying on the ground . . . He like bent over him . . . The officer got – went on top of him and they started fighting, [Plaintiff] swinging . . .[Henderson] proceeded to fight back.").)

[9] Earlier in his testimony, Plaintiff explained that he was unsure whether he was being shaken or punched: "[W]hen I woke up, there was somebody on top of me. The person on top of me was being very physical with me. He was shaking me, punching me, either or both." (Pl. Test. Tr. 48.) Because Plaintiff's testimony about possibly being punched was expressly uncertain, it cannot support a claim that Henderson in fact punched Plaintiff at this moment. *See DiStefano v. Sedita*, No. 11-CV-1125, 2014 WL 349251, at *9 n.4 (E.D.N.Y. Jan. 31, 2014) (granting summary judgment because a witness's deposition contrary testimony was expressly "uncertain" and because a later affidavit from the same witness confirmed an alternative account); *Newton v. City of New York*, 640 F. Supp. 2d 426, 444 (S.D.N.Y. 2009) (explaining that an "uncertain [deposition] response is insufficient to generate a genuine dispute of material fact in the face" of conflicting evidence). Moreover, Plaintiff clarified minutes later that he was *not* in fact punched, (Pl. Test. Tr. 50 ("I was being shaken, and I thought I was being punched.")); accordingly, Plaintiff's trial testimony, even if considered, does not support the allegation that Henderson punched Plaintiff while he was unconscious.

and shaking someone to see if they are alive may or may not be proper police protocol, but it is certainly not a "seizure" under the Fourth Amendment. *See County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) ("Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*" (emphasis in original) (citation and quotation marks omitted)). Moreover, any such "seizure" would serve a legitimate purpose (checking to see if Plaintiff was alive or conscious) and reflect only de minimis force. *See Musso*, 2008 WL 3200208, at *4 (explaining that de minimis uses of force are inactionable under the Fourth Amendment); *cf. Spencer v. Sullivan County*, No. 18-CV-365, 2019 WL 4514011, at *7 (S.D.N.Y. Sept. 19, 2019) ("[T]he use of even de minimis force that serves no purpose is not objectively reasonable." (citations omitted)). Accordingly, Plaintiff cannot sustain his Fourth Amendment claim based on Henderson's conduct during the period in which he was unconscious.

### b. Conduct When Plaintiff Awoke

Plaintiff also cannot sustain a Fourth Amendment claim based on Henderson's conduct after the Plaintiff regained consciousness.

First, Plaintiff has produced no admissible evidence suggesting that Henderson struck him at all. For example, Plaintiff stated in his deposition, "I didn't see [Henderson] strike me[, but a] lot of witnesses testified that." (Pl.'s Dep. 86.) Insofar as Plaintiff relies on the latter part of this statement to avoid summary judgment, he cannot do so because the statement is inadmissible hearsay. Fed. R. Evid. 801(c); *see also Raskin*, 125 F.3d at 66 ("The principles

governing admissibility of evidence do not change on a motion for summary judgment. . . . [O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." (citation omitted)).

Next, insofar as Plaintiff relies on Henderson's undisputed evidence, this evidence establishes only that Henderson struck Plaintiff after Plaintiff began to strike at him, including with a knife. (Henderson Aff. ¶ 14.) Crucially, the undisputed evidence also establishes that Henderson used force against Plaintiff only after Plaintiff was actively punching and stabbing him. (*Id.*) Indeed, Plaintiff's own deposition testimony is fully consistent with Henderson's account in this regard. For example, in his deposition testimony, Plaintiff explained that on waking and seeing someone above him, he "automatically start[ed] swinging" at the person above him because he thought that person was one of his assailants. (Pl.'s Dep. 83.) It was in reaction to that, Plaintiff explains, that his "hands were grabbed," "the knife was taken out," and "the next thing you know I remember being handcuffed." (*Id.* at 85.)

These facts preclude Plaintiff's claim of excessive force. Regardless of whether Henderson witnessed Plaintiff engage in any unlawful activity previously, the moment Plaintiff began striking at Henderson with a knife, "the facts and circumstances confronting" Henderson permitted the use of substantial force. *Mickle*, 297 F.3d at 120. Indeed, all three of the factors enumerated by the Supreme Court and commonly used by courts to evaluate Fourth Amendment excessive force claims, *see Spencer*, 2019 WL 4514011, at *6 (explaining that "courts are to consider" the three factors enumerated in *Graham*), cut strongly against Plaintiff. First, the moment Plaintiff began to strike at Henderson with a knife, Plaintiff was engaged in a potentially fatal assault on a police officer. He was therefore actively engaged in the commission of a serious crime. *See Mesa v. City of New York*, No. 09-CV-10464, 2013 WL 31002, at *20

(S.D.N.Y. Jan. 3, 2013) (finding that "assaulting a police officer is a serious offense," even when the assailant is "unarmed and a single woman" (citation omitted)).  Second, it is undisputed that Plaintiff repeatedly struck at Henderson with a knife, stabbing him in the neck and arm and nearly severing his carotid artery.  (Henderson Aff. ¶¶ 17–18.)  It is, therefore, practically a tautology to say that "the suspect pose[d] an immediate threat to the safety of the officers or others."  *Graham*, 490 U.S. at 396 (citation omitted); *see also Landy v. Irizarry*, 884 F. Supp. 788, 799 (S.D.N.Y. 1995) (finding that a suspect posed an immediate threat and granting summary judgment to police officers because a suspect was "believed to have assaulted an elderly woman . . . [and was] wrestling with a police officer and civilians").  Third, regardless of whether Plaintiff understood that the man above him was a police officer and therefore believed himself to be resisting arrest, an objectively reasonable officer would surely perceive attempts to stab and strike him as a form of resistance.  Objective analysis from the perspective of the officer is determinative.  *See Mesa*, 2013 WL 31002, at *20 ("[I]t is clear from [the officers'] depositions that they *perceived* [the plaintiff] to be resisting . . .[,] [and] this perception was objectively reasonable." (emphasis in original) (record citations omitted)).

   In sum, all evidence suggesting that Henderson used force against Plaintiff *also* makes abundantly clear that such force was objectively reasonable.  Accordingly, the record evidence does not support the claimed violation of the Fourth Amendment, and so the claim must be dismissed.

## III. Conclusion

For the foregoing reasons, the Court grants Henderson's Motion for Summary Judgment,

and thereby dismisses Plaintiff's one remaining claim and thus the Action.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No.

144), enter judgment for the one remaining Defendant, and close the case.

SO ORDERED.

DATED:      March 12, 2020
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE